UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| RONNIE MILES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO.: 1:11-CV-72-TLS |
| ) | |
| MONROE GROUP, LTD., ) | |
| d/b/a EAST CENTRAL TOWERS, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

This matter is before the Court on the Defendant's Motion for Summary Judgment With Respect to Plaintiff Ronnie Miles [ECF No. 24], filed by Defendant Monroe Group, Ltd., on May 4, 2012. The Defendant requests that the Court enter summary judgment in its favor on the Plaintiff's claim that it discriminated against him on the basis of his race in violation of 42 U.S.C. § 1981. The Plaintiff maintains that this case cannot be resolved by summary judgment because genuine issues of material fact require that a jury determine the motive behind the Defendant's decision to terminate his employment. For the reasons stated in this Opinion, the Court agrees with the Plaintiff that the record before the Court does not establish the Defendant's right to judgment as a matter of law.

## BACKGROUND

On January 21, 2011, Plaintiffs Leslie C. Anderson, Charles Miles, Ronnie Miles, and Tabrina Mudd sued their former employer, Monroe Group, Ltd., d/b/a East Central Towers, in Allen Superior Court. The Plaintiffs, all of whom are African American, alleged that the Defendant discriminated against them and terminated their employment on the basis of their race

in violation of 42 U.S.C. § 1981, which requires employers to treat minorities the same as non-minorities with respect to contractual benefits, including those related to at-will employment. The Defendant removed the matter to federal court and filed an Answer. Two of the Plaintiffs, Leslie Anderson and Charles Miles, settled their claims against the Defendant, leading to their dismissal from this cause [ECF No. 35]. The Defendant then filed separate motions for summary judgment with respect to Plaintiffs Tabrina Mudd and Ronnie Miles. However, upon the Court's granting of a Joint Motion to Dismiss Plaintiff Tabrina Mudd's Claims With Prejudice, Plaintiff Ronnie Miles is the only remaining Plaintiff.

On August 27, 2012, the parties' completed briefing on the Defendant's request for summary judgment with respect to Plaintiff Miles. The Defendant's position is that it discharged the Plaintiff's employment because he violated its Fair Housing Policy, verbally harassed and disrespected residents, and engaged in an inappropriate sexual relationship with a resident. The Defendant argues that the Plaintiff cannot establish that the Defendant did not honestly believe these reasons for terminating his employment. The Plaintiff claims that his § 1981 race discrimination claim survives summary judgment because genuine issues of material fact exist suggesting that the Defendant fabricated the reasons for his termination and that the real reason was his race.

### SUMMARY JUDGMENT STANDARD AND STATEMENT OF FACTS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The court's role in deciding a motion for summary judgment "is not to sift through the

evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Federal Rule of Civil Procedure 56 explains the procedures that parties must follow to support their factual positions in the summary judgment context. According to the rule,

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c). Additionally, at the summary judgment stage, the parties must produce "evidence of evidentiary quality" which means evidence that is admissible at trial. *See Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994). Before a document or exhibit may be admitted and considered in evaluating a motion for summary judgment, it must be authenticated. *Scott v. Edinburg*, 346 F.3d 752, 759–60 & n.7 (7th Cir. 2003). Under Federal Rule of Evidence 901, "[t]he requirement of authenticating or identifying an item of evidence" is satisfied by "evidence sufficient to support a finding that the item is what the proponent claims it is." With these standards in mind, the Court turns to the facts.

The Defendant is an apartment company that operates the East Central Towers, located in Fort Wayne, Indiana. The Defendant employed the Plaintiff from July 2, 2007, to February 16, 2009. The Plaintiff initially served as a Maintenance Tech and later as a Maintenance Supervisor. During his time as the Maintenance Supervisor, the Plaintiff was supervised by

Tammy Frantom, the Property Manager. The Plaintiff claims that his termination from employment was Frantom's act of intentional race discrimination. The Defendant maintains that its decision was a response to the Plaintiff's violation of its Fair Housing Policy, a violation of the Violence-Free Workplace Policy, and his involvement in an inappropriate sexual relationship with a resident of East Central Towers.

The Defendant, in support of its Statement of Material Facts, cites exclusively to the Plaintiff's deposition and exhibits attached thereto. Throughout his deposition, however, the Plaintiff disputed the reliability and veracity of most of these exhibits. The deposition is, thus, not sufficient to establish many of the facts the Defendant sets forth in support of summary judgment. For example, the Defendant states that it received several written complaints from residents about the Plaintiff. Throughout his deposition, the Plaintiff refers to the hand-written complaints as fabricated, manufactured, and fake, and he questions why all of the complaints are dated within a two day span. (Pl.'s Dep. 19, 25, 26, 27, 28, 29, 30, 31, 33, 34, 39, ECF No. 39-1.) Indeed, neither party suggests that the Plaintiff saw the hand-written complaints before the date of his deposition, and the Defendant does not present the testimony of any person who can verify that the exhibits are complaints about the Plaintiff that the Defendant in fact received. Because the record before the Court does not include any evidence to show that the complaints are what the Defendant claims they are, the Court will not consider them for purposes of determining the summary judgment motion.

In its Statement of Material Facts, the Defendant asserts that, on January 19, 2009, Frantom issued a written disciplinary notice to the Plaintiff for harassing residents verbally in an argumentative nature, using foul language with residents, and making residents and staff feel

verbally threatened. The Plaintiff maintains that Frantom told him that she had received sixty-seven complaints about the Plaintiff in one day, but that she and members of management from the corporate office, Liz Smith and Kathleen McGrath, had investigated and determined that they were false and unfounded. Although the Plaintiff's signature appears on the bottom of the written disciplinary notice dated January 19, 2009 (Pl.'s Dep. Ex. 14, ECF No. 26-3 at 8), the Plaintiff testified that it was not the same document that he signed, and that the document was fabricated. (Pl.'s Dep. 41:22–25, ECF No. 39-1 at 28 ("[A]nybody knows how to use a copier. You can fold it down and put whatever you want at the top of it and splice the other piece at the bottom. It don't take a rocket scientist to do that.").) The Plaintiff maintains that the document he actually signed was a verbal warning, and that it was not about his work performance. Because the Defendant does not present the affidavit or deposition of Frantom or anyone else who has personal knowledge of the creation of the document or its contents, the Court cannot consider it for purposes of ruling on the summary judgment motion.

According to the Defendant, the Plaintiff rolled his eyes at Frantom and she complained to Smith and Karen Goeken, the Human Resources Manager, through an email sent to them on February 11, 2009.[1] In the email, Frantom states that when she advised the Plaintiff that a particular unit was to be made available as a Manager's Unit, he responded that it was a Maintenance Unit and rolled his eyes at her. According to the Plaintiff, he once rolled his eyes at Frantom during a meeting when Frantom said that she was going to let the residents evaluate the employees' job performance. (Pl.'s Dep. 44:10–12.) But he denied that he had a conversation

---

[1] It is unclear why the Defendant included this fact, as the Defendant does not connect the email or the allegation that the Plaintiff rolled his eyes at Frantom to any employment action, including any of the reasons it provided as justification for terminating his employment.

5

with Frantom about the Manager's Unit where he rolled his eyes, stating that Frantom's account of the entire conversation was a lie. (*Id.* 59.) The Plaintiff had not seen the email before the day of his deposition and it has not otherwise been authenticated.

It is undisputed in the record before the Court that, on February 16, 2009, Frantom orally informed the Plaintiff that his employment was terminated and that the reason Frantom cited was that he passed out religious materials. The Plaintiff's deposition is sufficient to authenticate two flyers that the Plaintiff authored (Pl.'s Dep. Exs. 1 & 2, ECF No. 26-2 at 10–18). The Plaintiff also acknowledges that he was aware of one complaint that a resident wrote about the second flyer (Pl.'s Dep. Ex. 15, ECF No. 26-3 at 9), and another letter that a resident wrote stating that she had received a flyer (Pl.'s Dep. Ex. 16, ECF No. 26-3 at 10). The first flyer, handed out in February 2008, began with a quotation to biblical scripture, without reference to the source of the quote. The flyer then explained to the residents that the Plaintiff was dedicated to working to correct the problems with the building and improving the residents' quality of living. The Plaintiff then asked the residents to do their part by taking care of their units, placing trash in secured trash bags before placing them in the trash chutes, reporting problems, and having patience with the maintenance staff. The flyer ended with verses from the biblical book of Proverbs, but without identifying the source of the quote. The Plaintiff maintains that he obtained approval from Frantom and District Manager McGrath before distributing the flyer, and that Frantom helped him hand them out to the residents.

The Plaintiff states that he wrote the second flyer much later in 2008 and placed it in the lobby for residents to pick up if they chose to. He wrote the flyer to "address issues going around about certain tenants making accusations, telling residents that I . . . didn't like them and causing

problems. It was basically to address the issue of what the tenant was saying and to assure the rest of the residents that I had no problem with any of them." (Pl.'s Dep. 9:21–10:2.) The second flyer quotes several verses from the biblical book of Matthew, identifying the source of the quote. It also states that the Plaintiff is greeting the reader "in the name of JESUS, who is the head of my life and the reason I am who I am." (Pl.'s Dep. Ex. 2.) The flyer then contains over three pages of the Plaintiff's narrative of his relationship with two of the tenants, whom he referred to as "mud slinger # 1" and "mud slinger # 2" because they had "launched" a "vicious attack against [him]." (*Id.*) The Plaintiff explains that he had a sexual relationship with the second tenant and that when he broke it off, she made a vow to destroy him. Near the end of the flyer, the Plaintiff warns,

> those who jumped on that band wagon with those "mud slingers" "be not deceived GOD is not mocked for whatever a man sows, that shall he also reap.", "Can the blind lead the blind? Shall they not both fall into a ditch?", "Be sure your sins will find you out." "How shall I curse whom God hath not cursed? Or how shall I defy, whom the LORD hath not defied?", "TOUCH NOT MINE ANOINTED ONES, AND DO MY PROPHETS NO HARM."

(*Id.*) The Plaintiff then promises that he will continue to do his best for the residents and writes: "BE BLESSED IN THE NAMES OF OUR LORD AND SAVIOR JESUS CHRIST." (*Id.*)

According to the Plaintiff, a letter from Goeken dated February 26, 2009, is the first documentation that the Defendant provided to him with respect to his termination. In this letter, Goeken identified the reasons for the Plaintiff's termination of employment. She wrote that the Defendant required all employees to treat residents with respect and dignity, that company employees serve in a position of trust and must maintain a high level of professionalism, and that the Plaintiff breached this position of trust when he engaged in an inappropriate sexual relationship with a tenant. She stated that his relationship was a violation of Company policy.

7

Second, she cited the "religious newsletters" the Plaintiff provided to certain residents as a violation of the Company's Fair Housing Policy. Goeken wrote that the Plaintiff referenced the New Testament and urged residents to follow its teachings, and thus promoted a particular religious preference at the expense of residents who did not share his religious beliefs. Third, Goeken explained that the Plaintiff had been cited for verbally harassing and threatening co-workers and residents in violation of the Company's strict policy against violence or intimidation in the workplace.

In its presentation of the facts, the Defendant cites to another document (Pl.'s Dep. Ex. 19, ECF No. 26-3 at 12) that appears to address the reasons for the Defendant's employment action. It records the Plaintiff's dates of employment and is divided into three headings: Violation of Fair Housing Policy; Verbally Harassing (Disrespecting) Residents; and Engaging in an Inappropriate Sexual Relationship with a Tenant. The Defendant cites the documents as one of the pieces of evidence demonstrating that the reasons for terminating the Plaintiff's employment were honestly believed and did not change over time. The document, however, is not dated, the author is not identified, no recipient is indicated, and no evidence has been provided stating that the document is what the Defendant purports it to be.

In response to Goeken's statement of the reasons for his termination, the Plaintiff asserts that there was no policy against having a consensual sexual relationship with an adult tenant and the Defendant only revised the employee manual after it found out about the relationship, his flyers were not intended to persuade anybody about a particular religion or to preach but to clarify events that were occurring in the building, and that he never verbally threatened or harassed anybody or received a write-up for doing so.

The Plaintiff maintains that he heard Frantom make racist remarks when she referred to black people as "jigaboos," "niggers," "those people," "you people," and to Mexicans as "wetbacks." Specifically, the Plaintiff was talking to Frantom on the telephone sometime in 2008 when she said she was in her car looking at the lights installed at another apartment and "watching the jigaboos run around." (Pl.'s Dep. 86:6, ECF No. 26-1 at 20.) Later, near the date she informed the Plaintiff that he was fired, Frantom told the Plaintiff that she did not mean anything by calling those people jigaboos and she was just joking. Frantom's reference to "those people" was about tenants who had wrecked their apartment and happened to be black. She used the word nigger once in front of the Plaintiff on an unspecified date and another time he overheard her use it in conversation with another person in her office when she said, "Those niggers selling dope. I want them out of here." (Pl.'s Dep. 89:16–17, ECF No. 26-2 at 1.) The Plaintiff asserts that Frantom used the term wetbacks in 2008 in reference to Mexicans who applied for an apartment.

The Plaintiff testified that Goeken admitted to the Administrative Law Judge at his unemployment compensation hearing that she just took Frantom's word when making personnel decisions and did not hear from other employees. Goeken worked in the corporate office in Colorado. The Plaintiff states that he left several telephone messages for Goeken complaining that there were issues to be dealt with, but that she did not return his calls.

The Plaintiff notes that the Defendant terminated Leslie Anderson's employment on January 30, 2009, Charles Miles's on February 16, and Tabrina Mudd's on May 1. The Plaintiff, Anderson, and Mudd, who are all African American, were then replaced by non-blacks. The Defendant did not replace Charles Miles. Although the Plaintiff argues that Frantom was

9

instrumental in the terminations of these other employees, the record contains no evidence of the circumstances of the other terminations, except that Frantom fired Charles Miles at the same time that she fired the Plaintiff.

## ANALYSIS

The Plaintiff contends that the Defendant terminated his employment in violation of 42 U.S.C. § 1981, which prohibits discrimination on the basis of race in the making, enforcing, and terminating of contracts, including employment contracts. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975). The relevant analysis is the same for both Title VII and § 1981. *See Scaife v. Cook Cnty.*, 446 F.3d 735, 739 (7th Cir. 2006).

Relying on the direct method of proving discrimination, the Plaintiff contends that he has identified a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker. *See Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). The Seventh Circuit has recognized three distinguishable kinds of circumstantial evidence of intentional discrimination: (1) "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn"; (2) "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment"; and (3) "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the

employer's stated reason for the difference in treatment is unworthy of belief." *Troupe*, 20 F.3d at 736; *see also Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012). These three forms of circumstantial evidence can be used independently or in the aggregate, *Troupe*, 20 F.3d at 736, and "need not be a rich and varied body of circumstantial evidence . . . as long as what evidence there is adds up to discriminatory intent," *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 632 (7th Cir. 2009). "A plaintiff may survive a motion for summary judgment based only on circumstantial evidence under the direct method, but only if the circumstantial evidence presented points 'directly to a discriminatory reason for the employer's action.'" *Good*, 673 F.3d at 675 (quoting *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003)).

      The Plaintiff argues that circumstantial evidence provides a basis for an inference of intentional discrimination. He presents evidence of Frantom's discriminatory views of African Americans and Mexicans through her race-based comments and argues that Frantom was instrumental in his termination as well as that of three other African-American employees, and that three of the terminated employees were replaced by Caucasians. The Plaintiff submits that factual disputes exist concerning the events leading to the decision to terminate his employment, including the real reasons for his termination.

      The Plaintiff argues that the Defendant's stated reasons for terminating his employment—he violated its Fair Housing policy, verbally harassed and disrespected residents, and engaged in an inappropriate sexual relationship with a resident—were a mere pretext for discrimination under the last category of circumstantial evidence, which is substantially the same as the pretext evidence required under the indirect method of proof. *See Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003). In the context of employment discrimination

cases, a pretext is a dishonest explanation for the adverse employment action. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008). To show that the defendant's proffered reason is pretextual, the plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007). If the defendant honestly believed the reasons it gave, the plaintiff's effort to show pretext fails, regardless of whether that reason was "foolish, trivial or baseless." *Id.*; *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action."). Thus, the plaintiff cannot establish pretext merely by showing that defendant's decision to terminate him was "mistaken" or "ill considered." *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005) (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)).

The Plaintiff argues that an inference of pretext exists because, throughout the termination process and this litigation, the Defendant has presented changing reasons for terminating his employment. *See, e.g., Zaccagnini v. Charles Leby Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003); *O'Neil v. City of New Albany*, 293 F.3d 998, 1005–06 (7th Cir. 2002). The Plaintiff asserts that the Defendant refined its reasons for terminating the Plaintiff's employment when, in its Reply, it emphasized that the religious materials the Plaintiff distributed showed a preference for a particular religion. According to the Plaintiff, this refinement was necessary to render the Plaintiff's activity a violation of the Fair Housing Policy,

which only prohibits material that indicates a preference for a certain religion. In addition, he maintains that the Defendant's argument that the materials showed a preference does not match the reason provided to the Plaintiff at the time of his termination, which was simply that he "passed out religious material."

The Plaintiff is incorrect that the Defendant's claim that the flyers showed a preference for a particular religion first appeared in its Reply Brief. The letter dated February 26, 2009, ten days after the Plaintiff's employment was terminated, states that one reason that the Defendant terminated the Plaintiff's employment was for violating the Fair Housing Policy. Specifically, the letter of February 26 states that the Plaintiff breached the Policy when he "delivered religious newsletters to certain residents that reference the New Testament and urge residents to follow its teachings. In doing so, you promoted a particular religious preference at the expense of residents who do not share your religious beliefs." (Pl.'s Dep. Ex. 22, ECF No. 26-3 at 13.) In addition, the Court finds nothing curious in Frantom's failure to specifically articulate this nuance when she verbally informed the Plaintiff that he was being terminated for distributing religious material. Thus, the Defendant has not presented evidence from which it can be inferred that the Defendant's stated reason for terminating his employment changed, at least as it concerns the promotion of a particular religious preference.

The Plaintiff also claims that the flyers he authored do not support the decision to terminate his employment because they did not indicate a preference based on a protected class in violation of the Defendant's Fair Housing Policy Statement, which provides:

> Monroe Group, Ltd. (the "Company") is committed to abiding by all federal, state and local fair housing laws at all properties managed or owned by the Company. To that end, employees of the Company are prohibited from taking any of the following housing actions at any of the properties owned or managed by the

>    Company:
>
>    . . . .
>
>    Making, printing, or publishing a notice, statement, or advertisement that indicates any preference, limitation or discrimination based on a protected class.

(Fair Housing Policy Statement, Pl.'s Dep. Ex. 25, ECF No. 26-3 at 14.) Although the Plaintiff may have a valid point, his belief that he was not promoting a particular religion or showing a preference is not proof of what the Defendant believed with regard to the flyers. Even if the Defendant made a mistake about what the Fair Housing Policy prohibited, such a mistake would not establish pretext. However, the inquiry does not end here, as the Plaintiff's designated evidence does more than challenge the correctness of the Defendant's decision. The Court finds that the Plaintiff has submitted evidence of inconsistencies and contradictions surrounding the Defendant's responses to the flyers that could support a finding of pretext.

The evidence is that the Plaintiff obtained the Defendant's approval before distributing the first flyer, and that Frantom even helped him distribute it. Additionally, he received no discipline in connection with the flyer. In fact, six months after distributing the first flyer, the Plaintiff received the first ever "Monroe Award" for his "outstanding service, willingness to go above and beyond his required duties, and his kind and caring personality." (Monroe Group Cmty. Link Newsletter, ECF No. 39-3.) This is problematic for the Defendant's Motion for Summary Judgment because nothing in the record distinguishes the second flyer from the first. That is, the Defendant never explains why the first flyer did not violate the Fair Housing Policy Statement by taking a housing action that indicated a preference based on religion, but the second flyer did. Both flyers began with a scripture reference and then went on to provide the Plaintiff's perspective concerning events at the East Central Towers. Yet, the Defendant had

very different responses to the flyers authored by the same person just six to ten months apart; it took no disciplinary action after the first flyer and terminated the Plaintiff's employment after the second flyer. On the other hand, the letter Goeken sent to the Plaintiff explaining the reasons for his termination references "newsletters"—plural—suggesting that the Defendant was citing both flyers as grounds supporting his termination, despite the first flyer's earlier approval. This creates some doubt in the record whether the Defendant believed the flyers justified the termination of the Plaintiff's employment.

Whether the Defendant believed the other two reasons that it has offered in support of the Plaintiff's termination is also in dispute. The February 26, 2009, explanation letter advises that the Plaintiff had been cited for verbally harassing and threatening co-workers and residents. However, there is no such citation in the admissible evidence before the Court. Nor are there any other documents to support a conclusion that the Defendant had reason to believe that the Plaintiff treated co-workers or residents in a hostile manner. The Plaintiff claims that Frantom fabricated this reason, and that Goeken, who did not investigate the claim, acted on the misinformation. The Defendant also cites the Plaintiff's sexual relationship with a resident and contends that it was a violation of Company policy because he breached a position of trust. The Plaintiff readily admitted to Frantom that he had the relationship, but there is no evidence in the record that she or the other members of management considered it a breach of any of the Defendant's recognized policies and communicated this to the Plaintiff. The first mention of the relationship in the admissible documentation is the letter provided to the Plaintiff ten days after Frantom informed him that his employment was terminated. The letter did not identify the particular policy provision at issue. The circumstances surrounding the Plaintiff's termination

and his replacement by an employee outside the protected category are sufficient to present the Plaintiff's claim to a jury.

The Plaintiff has also presented evidence that Frantom, the person whom he claims provided the information that led to the termination of his employment, made race-based comments. The Defendant has not contradicted this evidence and presents no evidence of its own on the subject of who made the adverse decision or how the Defendant arrived at the decision to terminate the Plaintiff's employment. The Plaintiff has submitted evidence that the Defendant decided to terminate his employment based solely on Frantom's report of events to the Defendant's corporate Human Resources Manager, and that she accepted Frantom's version of events without investigation. In *Brewer v. Board of Trustees of University of Illinois*, 479 F.3d 908, 917 (7th Cir. 2007), the court explained that where an employee exercises "singular influence" over the decision maker "to harm the plaintiff for racial reasons, the actions of [that] employee . . . are imputed to the employer and the employer is in violation of Title VII." The Seventh Circuit has noted that an employee might exercise the required singular influence "by supplying misinformation or failing to provide relevant information to the person making the employment decision." *Id.*

The Defendant contends that, even if it is presumed to be true that Frantom exercised singular influence and made the alleged comments, these comments do not constitute evidence of discrimination because they were stray remarks unrelated to the specific employment decision at issue. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) (holding that there was no specific evidence linking the employer's alleged bigotry to the plaintiff's termination); *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) ("[B]igotry,

per se, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action."). The Seventh Circuit has stated that "a particular remark can provide an inference of discrimination when the remark was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (citing *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) and *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652–53 (7th Cir. 2000)); *see also Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010); *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781–82 (7th Cir. 2007) ("[S]tray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment." (quotation omitted)). However, the Seventh Circuit has also held that, while the recency of discriminatory comments is relevant to whether they help build a total picture of discrimination, recency alone is not the decisive factor. *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 528 (7th Cir. 2008); *see also Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 666 (7th Cir. 2006) (noting that how recent the comments were, how extreme, and who made the remark are pieces of evidence that inform whether the plaintiff has established an inference of discrimination under the direct method).

Here, there is sufficient evidence to suggest that a person with singular influence over the firing decision made the racist comments. The comments were also made relatively close in time to the adverse action and they range in severity. Although none of them relate directly to the employment decision, the comments are evidence from which a finder of fact could conclude that Frantom was racially biased. Given the lack of any link between the comments and the

employment decision, the Court finds that the comments would not, in isolation, support an inference that Frantom terminated the Plaintiff's employment because she harbored racial animus. However, the existence of numerous credibility questions and competing versions of the facts, particularly surrounding the decision to fire the Plaintiff and replace him with an employee outside the protected minority, precludes summary judgment in this case. Moreover, a dearth of evidence surrounding the information Frantom provided to management, including the light in which she presented it, when she presented it, and whether she believed the information she relayed, leaves open the possibility that her actions were the product of her bias. Given the nuances and inconsistencies of this case, the comments are simply one piece of evidence the Plaintiff has offered evidence that, when viewed most favorably to the Plaintiff, would permit a reasonable jury to infer that an impermissible purpose motivated the adverse employment action.

## CONCLUSION

For the reasons stated above, the Court DENIES the Defendant's Motion for Summary Judgment With Respect to Plaintiff Ronnie Miles [ECF No. 24]. The telephonic status/ruling conference set for January 17, 2013, at 11:00AM is CONFIRMED as a status/scheduling conference. The Court will initiate the call.

SO ORDERED on October 22, 2012.

                                                      s/ Theresa L. Springmann
                                                     THERESA L. SPRINGMANN
                                                     UNITED STATES DISTRICT COURT